IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Alana Schirmer, | : | |
| | : | Case No. 1:04CV345 |
| Plaintiff | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART |
| Enerfab, Inc., | : | AND DENYING IN PART |
| | : | MOTION FOR SUMMARY |
| Defendant. | : | JUDGMENT |

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc.

14.)  Plaintiff Alana Schirmer brought the following claims against her former employer,

defendant Enerfab, Inc. ("Enerfab"), after Enerfab terminated her employment: disability

discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the

"ADA") and the Ohio Civil Rights Act, O.R.C. § 4112 et seq. ("Section 4112"); gender

discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

("Title VII") and Section 4112; retaliation in violation of the Family Medical Leave Act, 29

U.S.C. § 2601 et seq. (the "FMLA"), Title VII, and Section 4112; and breach of Ohio public

policy.  (Doc. 1.)  Enerfab moved for summary judgment as to all of Schirmer's claims.  (Doc.

14.)  Schirmer then voluntarily dismissed her retaliation claims brought pursuant to Title VII and

Section 4112.  (Doc. 18 at 1.)  Accordingly, the Court considers Enerfab's motion as to the

remaining claims.  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN**

**PART** Defendant's motion.  The Court grants the motion as it relates to Schirmer's gender

discrimination and violation of Ohio public policy claims but denies the motion as it relates to Schirmer's disability discrimination and FMLA retaliation claims.

## I.     BACKGROUND

Enerfab is a manufacturing company that installs systems and provides and constructs pressure vessels and vessel components for the beverage, chemical, utility, and pharmaceutical industries.  (Doc. 14 at 1.)   Prior to a reorganization in September 2003, Enerfab had three divisions: the Fabrication Division, the Head Division, and the Process Systems Division.  (Bell dep. at 15.)  Alana Schirmer started working at Enerfab on August 9, 1999 as a secretary in the Head Division. (Compl. ¶ 7.)  Approximately seven weeks later, Enerfab promoted Schirmer to the position of Purchasing Agent in which she did purchasing for the Head Division.  (Schirmer dep. at 46.)  Schirmer did not have any prior experience in purchasing or in Enerfab's industry. (*Id.* at 47.)  In March 2000, Enerfab gave Schirmer the additional responsibility of doing some purchasing for the Process Systems division.  (*Id.* at 48.)  In 2001, Schirmer was one of two Purchasing Agents reporting to Purchasing Manager Stephen Hammoor.  (Hammoor dep. at 9-10.)  The other Purchasing Agent, Jeff Albert, did purchasing for Enerfab's Fabrication Division. In October 2001, Enerfab eliminated Albert's position, and Schirmer assumed his duties. (*Id.* at 10-11, 13.)

In December 2002, Enerfab purchased the Brighton Head Company, owned by Trinity Industries, which was absorbed into Enerfab's Head Division.  (Bell dep. at 10-11.)  As a result of the Trinity purchase, Enerfab hired approximately 50 Trinity employees, including Lori Bertsch and Mark Mills.  (*Id.* at 12-13.)  Bertsch, who had been employed by Trinity for 13 years, became a Purchasing Agent for Enerfab's Head Division, and Schirmer continued to do

purchasing for the Fabrication Division and to some extent the Process Division.  (Bertsch dep. at 6-7, 21;  Schirmer dep. at 103-04; Bell dep. at 21.)  Mills had been the Director of Purchasing at Trinity and assumed the same role for Enerfab.  In this position, Mills supervised Schirmer and Bertsch.  (Mills dep. at 14.)

In or around April 2003, Schirmer began experiencing headaches and other symptoms that caused her to miss time from work.  (Schirmer dep. at 133-135.)  Due to her symptoms, Schirmer worked only two days in the month of April.  (*Id.* at 134.)  At the end of April, Schirmer returned to work without restrictions.  (*Id.* at 136.)  However, she continued to miss approximately one day of work per week.  (*Id.* at 137.)  Nevertheless, Schirmer continued to receive her full salary.  (*Id.* at 136.)  Near the end of April 2003, Schirmer told Hock, an Enerfab executive vice president, that she was undergoing testing to determine whether she had multiple sclerosis ("MS").  (*Id.* at 55; Hock dep. at 20.)  Schirmer also told several Enerfab employees that she was experiencing health problems and that they might be attributed to MS.  (Mills dep. at 26-27; Bertsch dep. at 24.)  Schirmer's symptoms included vision problems, headaches, fatigue, and aches and pains. (Schirmer dep. at 134-136.)

At some point after April 2003 but before September 1, 2003, Schirmer requested FMLA paperwork from Enerfab's human resources director Mark Schoettmer.  (Schirmer dep. at 95, Schoettmer dep. at 44-45.)   However, Schirmer never completed the paperwork.  (Schirmer dep. at 96-97.)  Schirmer recalls that Schoettmer advised her to wait to fill out the paperwork until she needed more than one or two days off.  (Schirmer dep. at 96.)  Schoettmer denies telling Schirmer to wait to fill out the paperwork and testified that he told her to turn in the paperwork whenever she was ready to do so.  (Schoettmer dep. at 44-45.)  Schoettmer knew that Schirmer

3

had missed some work because of headaches but he did not know whether Schirmer's health condition had been diagnosed. (Schoettmer at 45-46.)

In August 2003, Jeff Hock, executive vice president of the Fabrication and Head Divisions, and David Winnestaffer, executive vice president of the Process Division, consolidated the Fabrication and Process Divisions into a single Process Solutions Group. (Hock dep. at 8-9, Winnestaffer dep. at 35-36, Mills dep. at 52, Bell dep. at 20.) Enerfab CEO Wendell Bell also was involved in the decision to consolidate the two business groups. (Bell dep. at 14-15). The goal of the consolidation was to make the business more efficient and to offer the customer a "total solution" to their needs rather than offering them separate piping and tank systems. (Hock dep. at 8-9, Winnestaffer dep. at 35-36.)

At some point, Hock and Winnestaffer determined that Enerfab would have to terminate certain individuals. (Hock dep. at 12-14.) Human Resources Vice President Ken Reynolds helped implement the terminations. (Hock dep. at 14; Reynolds dep. at 16, 20, 24-25.) Prior to the consolidation, Schirmer was responsible for purchasing for the Fabrication Division and to some extent the Process Division, and Dan Downey also did some purchasing for the Process Division. (Schirmer dep. at 103-04; Winnestaffer dep. at 31.) Downey, an Enerfab employee since 1978, worked in Enerfab's Process Division where he handled sales and subcontracting and reported to Dave Winnestaffer. (Downey dep. at 14, 16.) Downey had previously worked in Enerfab's purchasing department from 1994 to 2001, managing the department for approximately five years. (Downey dep. at 13-14.)

Hock and Winnestaffer developed a proposed list of persons to be laid off as a result of the consolidation of the Fabrication and Process divisions and solicited feedback from managers.

4

(Hock dep. at 14-15.)  Hock sought input from Purchasing Director Mark Mills about the relative skill sets of Bertsch and Schirmer.  (Hock dep. at 15, 17; Mills dep. at 53-57.)  Bertsch had thirteen years experience in purchasing for the head industry (Bertsch dep. at 6-7) whereas Schirmer had four years of experience.  Schirmer was a diligent worker, while Bertsch was strong in the areas of inventory management, CNC programming and had a larger knowledge of the carbon steel side of the business.  (Mills dep. at 56.)  Ultimately, Hock decided to terminate Schirmer, retain Bertsch in the purchasing department, and move Downey into the purchasing department from his former position in the Process Division.  (Hock dep. at 18, Mills dep. at 66-67).  In total, Enerfab eliminated five positions, including Schirmer's position and the positions of four male employees.  (Reynolds dep. at 24-26, 34-35.)  Enerfab terminated Schirmer on September 1, 2003.  More than one year later, in October 2004, Schirmer's physician diagnosed her as having MS.  (Schirmer dep. at 139.)

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56©).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." *Id.* at 252.

## III. ANALYSIS

### A. Statutory Discrimination and Retaliation Claims

Schirmer brings four claims against Enerfab: disability discrimination, gender discrimination, FMLA retaliation, and breach of Ohio public policy.[1] In order to establish a discrimination claim, a plaintiff must produce either direct or circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Schirmer presents no direct evidence that Enerfab unlawfully discriminated or retaliated against her on any of the alleged bases.[2] Therefore, she must make her case with indirect evidence under the burden-

---

[1] Schirmer brings her disability and gender discrimination claims under both federal and state law.

[2] An example of direct evidence is when an employer tells an employee, "I fired you because you are disabled." *See Smith v. Chrysler Corp*, 155 F.3d 799, 805 (6th Cir. 1998). In this case, no one ever told Schirmer that her alleged disability or her gender were a factor in the decision to terminate her: no one she reported to ever said anything that made her think her gender was holding her back from advancement (Schirmer dep. at 110), and no one ever said

6

shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

*See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184-85 (6th Cir. 1996).

Under the *McDonnell Douglas* analysis, a plaintiff must first make a prima facie showing

on the discrimination or retaliation claim.  If the plaintiff makes such a showing, the burden

shifts to the employer to show a nondiscriminatory reason for its employment decision.  *Monette*,

90 F.3d at 1186; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).

If the employer satisfies this burden of production, then the plaintiff must prove by a

preponderance of the evidence that the employer's proffered reason was not its true reason but

was, in fact, a pretext for illegal discrimination or retaliation.  *Burdine*, 450 U.S. at 256.  The

plaintiff retains the ultimate burden of persuasion at all times.  *Id.*

Applying this analysis, Schirmer first must establish the prima facie elements of

disability discrimination, gender discrimination, and FMLA retaliation.  Because the elements of

these claims differ, they will be discussed separately below.  The remainder of the burden-

shifting test is the same for each of the claims.  That is, if Schirmer is able to establish a prima

facie case on a claim, the burden of production shifts to Enerfab to provide a legitimate,

nondiscriminatory reason for its decision to terminate Schirmer.  If, on the other hand, Schirmer

fails to establish a predicate fact necessary to create the presumption of unlawful intent, the

burden never shifts to Enerfab.  *Monette*, 90 F.3d  at 1185.

In the event the burden of production does shift to Enerfab, it has asserted that it had a

nondiscriminatory reason for Schirmer's termination, namely, that her termination was part of a

corporate restructuring that resulted in a reduction in force ("RIF").  Because Enerfab has

---

anything negative to her about her medical issues (*id.* at 67).

7

articulated a nondiscriminatory reason for terminating Schirmer, she must prove by a preponderance of the evidence that Enerfab's reason for terminating her was not, in fact, because of the restructuring but was a pretext for illegal discrimination or retaliation.

### 1.      Disability Discrimination

Schirmer claims that she is disabled by multiple sclerosis, that Enerfab perceived her as disabled due to her multiple sclerosis, and that Enerfab discriminated against her by terminating her employment in violation of the ADA.  (Doc. 1 at 3-4.)  Enerfab counters that Schirmer is not disabled, that she was terminated because of a RIF, and that she cannot demonstrate that her termination was a pretext for unlawful disability discrimination.  Schirmer asserts her disability discrimination claims both under the ADA and Ohio Revised Code § 4112.[3]  Because both federal and Ohio disability discrimination actions require the same analysis, the Court will analyze Schirmer's state and federal discrimination claims solely under the ADA.  *See Martin v. Barnestille Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 n. 2 (6th Cir. 2000).

The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Under the *McDonnell Douglas* analysis, Schirmer must demonstrate a prima facie case of discrimination by showing that at the time of her termination (1) she was an individual with a "disability" as

---

[3]  Ohio Revised Code § 4112.02 provides: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

defined by the ADA; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) Enerfab knew or had reason to know of Schirmer's disability; and (5) additional direct, circumstantial, or statistical evidence tending to indicate that Enerfab singled out Schirmer for discharge because of her disability.[4] *See Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996); *Kvintus v. R.L. Polk & Co.,* 194 F.3d 1313, 1999 WL 1000824, *4 (6th Cir. 1999).

Beginning with the first prong, the ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of having such an impairment; or (C) being regarded as having such an impairment."[5] 42 U.S.C. § 12102(2). Major life activities include walking, seeing, hearing, speaking, breathing, learning, caring for oneself, performing manual tasks, and working. 29 C.F.R. § 1630.2(I). "Substantially limits" means "unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the

_____

[4] The fifth prong of the *Monette* analysis is that the disabled individual was replaced by another individual. *Monette*, 90 F.3d at 1186. In this case, Schirmer's position was eliminated through an organizational restructuring and her job functions continued to be performed by other, existing personnel. Because "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work," (*Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)), Schirmer would be unable to demonstrate the traditional fifth element of the *Monette* test. The Sixth Circuit has accordingly modified the "replacement" element of the prima facie test to allow plaintiffs in reduction-in-force scenarios to establish a prima facie case of discrimination. In such cases, the plaintiff may substitute "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Kvintus,* 194 F.3d 1313, 1999 WL 1000824, *4 (6th Cir. 1999) (citing *Barnes*, 896 F.2d at 1465).

[5] "A person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521-22 (1999).

condition, manner or duration under which an individual can perform a particular major life activity." 29 C.F.R. § 1630.2(j)(1).  Factors to be considered include "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  Id. at § 1630.2(j)(2).

The Supreme Court has set forth a three-step approach to reading subsection (A) of the definition of disability.  First, the Court considers whether a condition is an impairment; second, it identifies the life activity the plaintiff relies upon and determines whether it is a major life activity; and third, the Court asks whether the impairment substantially limits the major life activity.  *Williams v. Stark Cty. Bd. of Cty. Comm'rs*, 7 Fed.Appx. 441, 2001 WL 302035, **3 (6th Cir. 2001) (citing *Bragdon v. Abbott*, 524 U.S. 624, 630-31 (1998)).

Schirmer has failed to set forth evidence sufficient to support a finding that at the time of her termination she had a physical or mental impairment that substantially limited one or more of her major life activities.  42 U.S.C. § 12102(2)(A).  Multiple sclerosis qualifies as an "impairment" for the purposes of the ADA.  *See, e.g.*, O.R.C. § 4112.01(16)(a); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir. 1996), *Puckett v. Park Place Entertainment Corp.*, 332 F.Supp.2d 1349, 1353 (D. Nevada 2004); *Frazier v. Simmons*, 90 F.Supp.2d 1221, 1225 (D. Kans. 2000).  However, Schirmer has not shown that MS substantially limited any of her major life activities at the time of her termination in September 2003.[6]

---

[6] That Schirmer has been diagnosed as having MS does not, in of itself, mean that she is disabled under the Act: "[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual...."  29 C.F.R. § 1630, App. B.

The evidence in the record demonstrates that Schirmer's headaches, fatigue, vision problems, and other symptoms occurred intermittently and were temporary in duration. According to the medical history that Schirmer gave to her physician in May 2003, Schirmer experienced double vision on April 5-6, 2003 which completely resolved within two weeks. (Schirmer dep. at 134-136, Ex. 10.)  The following week, on April 17, she had her most severe episode, which lasted only a few hours.  (*Id.*, Ex. 10.)  At that time, Schirmer became lightheaded and experienced tunnel vision, a headache, and a sense of generalized weakness. (*Id.*)  She was hospitalized that day and "a few hours after admission she was fine with normal exam."  (*Id.*)  Schirmer testified that she missed work almost the entire month of April 2003 but that she then returned to work without restrictions.  (*Id.* at 134-36, Ex. 22.)  At least seven of the days that she missed in April were attributable to a lumbar puncture procedure and not to her illness.  (*Id.* at 135.)  On this record, there is no genuine issue that as of September 2003, Schirmer did not have an impairment that substantially affected a major life activity.[7]

The Court's finding that Schirmer did not, at the time of her termination, have an impairment that substantially limited one or more major life activities does not end the inquiry into whether she was disabled within the meaning of the ADA.  Schirmer may still satisfy the first prong of a prima facie case of disability discrimination by presenting evidence to support a finding either that there was a record that she had such an impairment or that Enerfab regarded her as having such an impairment.  42 U.S.C. § 12102(2)(B) and (C).  Construed in a light most

---

[7] Enerfab points out it its motion that as of her deposition in April 2005, Schirmer was able to work full time, take university classes two nights a week, take care of herself and her pets, volunteer to take care of animals at a veterinary facility, and do housework.  (Doc. 14 at 10-11.)  However, the relevant point of inquiry is whether Schirmer was disabled at the time of her termination, not at some later date.  *See Kocsis*, 97 F.3d 876, n. 13 (6th Cir. 1996)(citing cases).

favorable to Schirmer, the evidence creates a genuine issue as to whether Enerfab regarded Schirmer as having a substantially limiting disability when it terminated her.

There are three ways a plaintiff can show that she is "regarded" as having a disability: (1) she may have an impairment which is not substantially limiting but is perceived by the employer as constituting a substantially limiting impairment; (2) she may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or (3) she may have no impairment at all but is regarded by the employer as having a substantially limiting impairment. 29 C.F.R. § 1630, App. B. The record demonstrates that during the spring and summer of 2003, Schirmer informed her supervisor and other Enerfab employees of her suspicion that she might have MS. Enerfab management knew Schirmer was experiencing headaches, double vision, and fatigue, and that Schirmer was missing time from work. (Downey dep. at 19, Bertsch dep. at 24, Mills dep. at 31-32, Hock dep. at 20, Schoettmer.dep. at 45, Reynolds dep. at 51.) Schirmer occasionally required coworkers to drive her to and from work because she couldn't see. (Schirmer dep. at 134.) Schirmer's manager perceived that her job performance was suffering as a result of her health problems. (Mills dep. at 33.) Then, Schirmer requested FMLA paperwork from the human resources department, signifying her intent to take additional time off work because of her illness.

Construed in a light most favorable to Schirmer, this evidence could lead a reasonable jury to find that Enerfab perceived Schirmer's illness, with its symptoms of vision loss and inability to work, as a substantially limiting impairment. Because she has shown that a genuine issue of material fact exists as to whether she had, at the time of her termination, a "disability" as

12

the term is defined by 42 U.S.C. § 12102(2)(C), Schirmer has satisfied the first prong of the prima facie case of disability discrimination.

Regarding the second and third prongs of the prima facie case, Schirmer has put forth evidence to show, and Enerfab does not dispute (*see* Doc. 14 at 14), that Schirmer was otherwise qualified for the position and that she suffered a materially adverse employment decision. Regarding the fourth prong, the Court concludes from the evidence discussed above that there is a genuine issue as to whether Enerfab knew or had reason to know of Schirmer's disability.

Regarding the fifth and final prong of the analysis, whether there is additional direct, circumstantial, or statistical evidence tending to indicate that Enerfab singled out Schirmer for discharge because of her disability, Schirmer presents the following facts: Schirmer's job duties were assumed by Bertsch and Downey, both non-disabled employees who had never taken FMLA leave. A confidential internal memorandum concerning another former Enerfab employee notes Enerfab's intent to lay off the employee, that she has "medical issues" and "may be going in for more surgery soon," and that "[i]f we replace her, we cannot call it a lay off. We will expose ourselves to age and medical discrimination claims." (Schirmer dep. Ex. 1 at 1707.) Taken together, these facts create a genuine issue as to whether Enerfab singled Schirmer out for discharge because of her disability. Accordingly, Schirmer has made a prima facie showing of disability discrimination.

Under the *McDonnell Douglas* analysis, the burden shifts to Enerfab to articulate a legitimate, nondiscriminatory basis for terminating Schirmer. It has done so by stating that her termination was based on a business decision to eliminate her position when it consolidated its Fabrication and Process Divisions. The burden thus returns to Schirmer to prove by the

13

preponderance of the evidence that Enerfab's stated reason for terminating her, the consolidation, was in fact a pretext for illegal discrimination. Schirmer may establish pretext by showing that Enerfab's proffered reason for her discharge had no basis in fact, did not actually motivate the discharge, or was insufficient to motivate the discharge. *Kocsis*, 97 F.3d at 883 (6th Cir. 1996) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994)).

While the Court will not use Schirmer's claim of discrimination as "a vehicle for judicial review of [Enerfab's] business decisions," (*see, e.g., Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982)), neither will it give unwarranted deference to Enerfab's business judgment defense. *See Wexler*, 317 F.3d at 576 ("An employer's business judgment ... is not an absolute defense to unlawful discrimination.") Schirmer has presented evidence that her supervisor did not agree with the decision to eliminate her position. (Mills dep. at 62, 64 ("Q. Did you agree with the company's choice to select Ms. Schirmer for layoff? ... A. At the time I did not like what I was hearing. I did not agree with that."... Q. –did you agree with the decision to select Ms. Schirmer? A. I had no bearing in that decision.").) Hock then transferred Downey to the purchasing department without involving Mills in the decision. (Mills dep. at 69-70.) In other words, Mills was not given an opportunity to review the skills set of the person whom ultimately took over the work Schirmer had performed.

Furthermore, testimony from Enerfab's executives reveal discrepancies regarding the information sought when making the decision to terminate Schirmer and the person responsible for the reorganization. For example, Hock testified at his deposition that he solicited feedback from Mills regarding the reorganization and that Mills told him "[Schirmer] didn't do some of

14

the things that Lori [Bertsch] did, didn't do some of the things Dan Downey did...."  (Hock dep. at 16.)  However, Mills testified that Hock asked him to analyze only the skill sets of Schirmer and Bertch, not Downey.  Bell's testimony that Hock and Winnestaffer recommended Schirmer for termination (Bell dep. at 21) is also contradicted by Winnestaffer's testimony that Winnestaffer was not involved in the process by which Schirmer was selected for termination. (Winnestaffer dep. at 16).  Additionally, Hock testified that he and Winnestaffer decided to implement the reorganization (Hock dep. at 9), yet Bell testified that the reorganization was his idea (Bell dep. at 15).  Similar inconsistencies prompted the Sixth Circuit to affirm a jury award in an en banc decision in a case involving a claim of retaliation.  *See White v. Burlington Morthern & Santa Fe Railway Co.*, 364 F.3d 789 (2004) (finding that, with respect to the challenged suspension, "the evidence was not ... consistent regarding who made the decision...")

When construed in a light most favorable to Schirmer, together with all the inferences that can be drawn therefrom, the evidence concerning Enerfab's knowledge of Schirmer's health problems and missed work, Schirmer's termination against her manager's wishes, the inconsistent testimony regarding the process behind the reorganization and Schirmer's termination, and the confidential Enerfab memorandum expressing the company's awareness that if it terminated and replaced an employee with health issues that it might "expose [itself] to ... [a] medical discrimination claim" (Schirmer dep. Ex. 1 at 1207) is sufficient to create a genuine issue as to whether Enerfab's stated reason for terminating Schirmer was, in fact, a pretext for disability discrimination.

### 2.    Gender Discrimination

Schirmer next asserts that Enerfab treated her differently than similarly-situated male employees and terminated her employment because of her gender.  (Doc. 1 at 5.)  Enerfab denies that Schirmer's gender was a factor in its decision to terminate her and further claims that it has employed women in a variety of positions, that Schirmer herself had been retained over a male employee in 2001, and that one of the two employees selected for retention in the 2003 reorganization was a female.  (Doc. 14 at 19-21.)  Because federal case law governing Title VII actions is generally applicable to discrimination claims under Ohio law, the Court will analyze Schirmer's gender discrimination claim in terms of federal law.  *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004).

To establish a gender discrimination claim under Title VII, Schirmer must show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Peltier v. U.S.,* 388 F.3d 984, 987 (6th Cir. 2004).  In situations such as this, where the employee's position is eliminated through a reduction in force, the fourth criteria is modified and the employee must instead present "additional direct, circumstantial or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (*citing LaGrant v. Gulf & Western Mfg. Co.*, 748 F.2d 1087 (6th Cir. 1984)). While the plaintiff in a RIF case therefore carries a greater burden

than plaintiffs who are replaced by a person outside the protected class, the augmented standard does not create an undue hardship. *Barnes*, 896 F.2d at 1464-65.[8]

Enerfab does not dispute that Schirmer has satisfied the first three elements of the prima facie case. Rather, it relies on its position that Schirmer cannot satisfy the fourth element by proffering additional evidence that her gender was a determining factor in the elimination of her position. (Doc. 14 at 19.) Schirmer argues that the following evidence supports her gender discrimination claim: (1) her former supervisor Hammoor "advised [her] that it would sometimes benefit [her] to be more laid back and calm" (Schirmer dep. at 106-07); (2) "[t]he fact that there is no woman above a secretary or purchasing agent in the entire company," (*id.* at 108); (3) she "heard rumors that it ha[d] been said by upper management ... that a woman will go nowhere"; (4) and Schirmer's request that Enerfab install shower facilities for women on site was not approved by the suggestion committee, of which Schirmer herself was a member (*id.* at 112-114).

This evidence is insufficient to lead a reasonable jury to conclude that gender was a determining factor in Enerfab's decision to terminate Schirmer. First, Hammoor's statement that

---

[8] Schirmer argues that Downey "replaced" her rather than being retained over her, thereby suggesting that the case is not truly one of work force reduction. (Doc. 18 at 14.) "An employee is not eliminated as a part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Barnes*, 896 F.2d at 1465.

The evidence demonstrates that this is, in fact, a RIF case: Downey testified that when he went to work in the Purchasing Group under the supervision of Mills, he began performing the role of purchasing agent *in addition to* other responsibilities (Downey dep. at 36-37); and Mills testified that Downey brought with him other responsibilities from his former position when he began working as purchasing agent (Mills dep. at 66-67 ("He [Downey] brought other responsibilities with him. He just began to fulfill some of [Schirmer's] role.... He did not just drop everything he did.").)

it might benefit Schirmer to be more laid back and calm is entirely gender neutral.  Second,

Schirmer's assertion that there was no woman above a secretary or purchasing agent was

unsupported by evidence and was refuted by the affidavit of Enerfab executive vice president

Kenneth Reynolds and the deposition testimony of Schirmer's former manager Steve Hammor

(Doc. 14, Ex. I; Hammoor dep. at 5).[9]

        As support for her third contention, that a member of Enerfab's management said Enerfab

was "not interested in the advancement of women," Schirmer submits the affidavit of former

Enerfab employee Barbara Hampton.  (Doc. 18, Ex. C.)  Hampton states in her affidavit, inter

alia, that human resources manager Schoettmer told her Enerfab was "not interested in the

advancement of women."  (Id. at ¶ 9.)[10]  However, Schirmer cannot rely on Hampton's affidavit

as evidence that Enerfab terminated Schirmer for improper reasons.

        Alleged statements of an employer that cannot logically or reasonably be tied to the

decision to terminate a plaintiff are irrelevant to a discrimination case and should be excluded.

See Schrand v. Fed. Pacific Elec. Co., 851 F.2d 152, 156 (6th Cir. 1988).  Hampton's statements

are not relevant to whether Schirmer's gender was a motivating factor in Enerfab's decision to

terminate her.  Hampton's statements generally relate to promotion practices, not termination.

Schirmer does not claim that she was not promoted because she is female.  In fact, Schirmer was

_____

        [9]  During the past several years, Enerfab has employed females in a variety of positions
including chemical engineer, accountant, administrative assistant, executive secretary,
programmer, estimator, and cost accountant.  (Doc. 14, Ex. I, ¶ 3).

        [10]  Hampton also states in her affidavit that in 2001 Enerfab did not promote her to a
position she wanted, that executive vice president Jeff Hock extended lunch invitations to men
but not to her, and that Enerfab president and CEO Wendell Bell complimented a male employee
but did not give Hampton a like compliment when he learned that she was the one responsible
for the award-winning project.  (Doc. 18, Ex. C.)

quickly promoted at Enerfab, was happy with her salary increases, and was happy with the additional responsibilities she was given.  (Schirmer dep. at 110-11.)

Furthermore, allegedly discriminatory statements by personnel who are not involved in the decision to terminate an employee are not relevant to a discrimination claim.  *See, e.g., Schrand v. Fed. Pacific Elec. Co.*, 851 F.2d 152, 156 (1988) (holding that an alleged statement indicating age bias was irrelevant because the person making the statement did not make the decision to terminate the plaintiff); *Boyle v. Mannesmann Demag Corp.*, 991 F.2d 794, 1993 WL 113734 at **2 (6th Cir. 1993) (same); *cf. Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (concluding for the purpose of a summary judgment motion that a division vice president's age-biased statements could not be excluded where he "was involved in some parts of the discussion" on whether to deny plaintiff a requested transfer).  The person primarily responsible for the decision to eliminate Schirmer's position was executive vice president Jeffrey Hock.  (Hock dep. at 18 ("The decision was mine to make.").)  Hock did not consult Schoettmer regarding the decision to terminate Schirmer, and Schoettmer had no role in the decision to terminate Schirmer.  (Schoettmer dep. at 32-33 ("Q.  Did anybody consult you about how to implement the reorganization decisions in any way?  A.  No. ... Q.  Did anybody consult with you on who to lay off? ... A.  No, I was not in the discussions on it.").)  That Schoettmer allegedly told Hampton that Enerfab was not interested in the promotion of women is therefore irrelevant to Schirmer's claim.

Finally, that Schirmer's request that Enerfab install shower facilities for women was turned down by the suggestion committee is in no way relevant to whether Enerfab singled out Schirmer for termination because of her gender.  The committee's refusal to approve on-site

19

shower facilities for women does not reasonably indicate a gender bias, particularly when Enerfab made arrangements for all of its employees to use the showers, locker rooms, and exercise facilities of a nearby university, a benefit used by both male and female employees. (Schirmer dep. at 112-14.)

The evidence presented by Schirmer on the fourth prong of the prima facie case in a RIF scenario must be "sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [her protected status]." *Barnes*, 896 F.2d at 1466.  Schirmer has failed to meet this burden.  Therefore, the Court need not analyze whether Schirmer could show that Enerfab's RIF was a mere pretext for discrimination.

### 3.    FMLA Retaliation

Schirmer next claims that she exercised her FMLA rights by taking intermittent leaves due to her health condition and that Enerfab violated the FMLA when it terminated Schirmer's employment in retaliation for her use of FMLA-protected leave.  (Doc. 1 ¶ 41-42.)  Enerfab argues that Schirmer's FMLA retaliation claim must fail because she never filled out the FMLA paperwork and thus never utilized the FMLA (Doc. 20 at 5), and that even if she had taken FMLA leave she cannot show that there was a causal connection between her exercise of rights under the FMLA and Enerfab's RIF resulting in the termination of Schirmer's employment (Doc. 14 at 22).

The FMLA entitles an eligible employee to twelve weeks of leave during any twelve-month period because of, inter alia, "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  It is unlawful for an employer to discharge or in any other manner discriminate against any individual

for opposing any practice made unlawful by the FMLA. 29 U.S.C. § 2615(a)(2). The FMLA also prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" its employees' rights under the statute. 29 U.S.C. § 2615(a)(1).[11]

Schirmer pursues a retaliation theory of recovery under the FMLA, asserting that Enerfab "violated the FMLA when it terminated Plaintiff's employment in retaliation for her use of FMLA protected leave." (Doc. 1 ¶ 42.) To make a prima facie case of retaliation, Schirmer

---

[11] The Sixth Circuit recognizes that subsections (a)(1) and (a)(2) of the statute establish two distinct theories of recovery: those of entitlement and of retaliation. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). Under the entitlement theory, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA–for example, a twelve-week leave or reinstatement after taking a medical leave." *Id.* (citing *Arban v. West Pub. Co.*, 345 F.3d 390, 401 (6th Cir. 2003)). The employer's intent is not a relevant part of the entitlement inquiry under § 2615, and the Court need not apply the *McDonnell Douglas* burden-shifting test in such cases. *Id.* at 507, 508; *see also Schmauch v. Honda of Am. Mfg. Inc.*, 295 F.Supp. 823, 828-31 (S.D. Ohio 2003).

Under the retaliation theory of recovery, on the other hand, an employer's motive is an integral part of the analysis. *Edgar*, 443 F.3d at 508 (*citing Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998)). "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.* The Sixth Circuit applies the *McDonnell Douglas* burden-shifting test to retaliation claims under the FMLA. *Id.* (*citing Skrjank v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001)).

Schirmer does not pursue an entitlement theory of recovery: she does not argue that Enerfab interfered with the exercise of her rights under the statute, and she affirmatively states that she in fact exercised her FMLA rights by taking intermittent leaves. (Doc. 1 ¶ 41.) Because Schirmer admits that she exercised her FMLA rights and does not pursue an interference claim, the Court need not analyze whether Enerfab interfered with her rights under 29 U.S.C. § 2615(a)(1). It is worth noting, however, that discouraging an employee from using FMLA leave constitutes interference with an employee's exercise of rights under the FMLA. 29 C.F.R. § 825.220(b).

Had Schirmer made a claim under the entitlement theory embodied in 29 U.S.C. § 2615(a)(1), she would have to have proved that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. *Edgar*, 443 F.3d at 507 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

must show that: (1) she availed herself of a protected right under the FMLA by notifying Enerfab of her intent to take leave, (2) she suffered an adverse employment action, and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). If Schirmer satisfies these three requirements, the burden shifts to Enerfab to proffer a legitimate, nondiscriminatory rationale for terminating Schirmer. *Id.*

In the briefs filed with the Court, both parties gave only cursory treatment to the question of whether Schirmer availed herself of the rights protected by the FMLA.[12] Enerfab states that Schirmer "did not actually take any FMLA leave, and ... all of her time off due to any medical issues she may have had was treated by the company as paid time off."[13] (Doc. 14 at 22). Schirmer takes an equally presumptive position, stating that because she took off almost the entire month of April and requested FMLA paperwork, and because Enerfab had discussed the rising cost of benefits, a jury could infer that Schirmer availed herself of a right protected by the FMLA. (Doc. 18 at 11.)

The Court is compelled to make a more critical analysis of whether Schirmer, in fact, availed herself of a protected right under the FMLA. The Act entitles an eligible employee to twelve weeks of leave during any twelve-month period because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29

---

[12] For the sake of its motion to dismiss, Enerfab assumed that Schirmer's request for FMLA forms and taking time off for her own medical condition would satisfy the first element of the prima facie case. (Doc. 14 at 22.)

[13] Enerfab's assertion that "the statute provides only for job-protected, *unpaid* leave for employees with serious health conditions" (Doc. 14 at 22) is erroneous: "leave granted under [the FMLA] *may* consist of unpaid leave." 29 U.S.C. § 2612 (c) (emphasis added).

U.S.C. § 2612(a)(1)(D).  A "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).   A serious health condition involving continuing treatment by a health care provider includes "[a]ny period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.114(a)(2)(iii).  The regulations further define a "chronic serious health condition [a]s one which: (A) Requires periodic visits for treatment by a health care provider ...; (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." *Id.*

To invoke FMLA protection for a serious health condition, the employee must request leave and give the employer notice that she is requesting such leave for a serious health condition that renders her unable to perform her duties.  *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 421(6th Cir. 2004) (citing cases).  The notice that an employee is required to give depends on the facts of the particular case.  29 C.F.R. § 825.303.  When the timing of the need for leave is not foreseeable, an employee is expected to give notice to the employer within one or two working days of learning of the need for leave.  *Id.*  When the timing of the need for leave is foreseeable, an employee must provide the employer at least 30 days advance notice or as soon as practicable.  29 C.F.R. § 825.302. However, "*[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.*"  29 C.F.R. §§ 825.302, 825.303 (emphasis added).  Furthermore, days taken off because of a serious health condition need not be consecutive but may be intermittent. 29 U.S.C. § 2612(b)(1).

23

Given these statutory requirements and definitions, the Court concludes that Schirmer has satisfied the first element of the prima facie case of FMLA retaliation. Schirmer's illness, which required both inpatient care and continuing treatment, constituted a serious health condition entitling Schirmer to FMLA leave. *See* 29 C.F.C. § 825.114. Schirmer also gave substantive notice of both her unforeseeable and foreseeable need for leave within the requisite time frame. *See* 29 C.F.C. §§ 825.302, 825.303. Regarding the unforeseeable need for leave, Mills testified that Schirmer was in direct contact with him about the time she needed off: "Q. Ms. Schirmer appropriately communicated to you the fact she was out on medical leave, is that right? A. Um-hmm. There was an illness, yes.... She kept direct contact with me." (Mills dep. at 28-29.) Schirmer also indicated that she explained to Mills the severity of her condition: "He [Mills] knew that, you know, after my one LP, my lumbar puncture, I'm lying on the floor in my living room. He [Mills] knew I was calling the job site making sure they're okay, are you guys' needs getting met. I can't move, but what can I do here." (Schirmer dep. at 133.) Regarding the foreseeable need for leave, Schirmer appropriately requested FMLA paperwork from Enerfab. Accordingly, she has satisfied the first element of the prima facie case of FMLA retaliation.

Schirmer also has satisfied the second element of the prima facie case: her termination is unarguably an adverse employment action.

With respect to the third element of the prima facie case, that there is a causal connection between her time off and her termination, Schirmer largely relies on the temporal proximity between the time she took off from work, her request for FMLA paperwork, and her

24

termination.[14]  The Sixth Circuit has affirmed that a plaintiff satisfies the third prong of a prima

facie case of retaliatory discharge when the plaintiff can present indirect evidence of a causal

connection between the exercise of FMLA rights and the adverse employment action because of

the proximity in time between the plaintiff's request for leave and his discharge.  *See Skrjanc*,

272 F.3d at 314.  Accordingly, Schirmer has made a showing of causation sufficient to satisfy

the third prong of the prima facie case of retaliation.

Because Schirmer has made a prima facie showing of impermissible retaliation, the

burden shifts to Enerfab to "articulate a valid rationale" for her discharge.  *Hartsel v. Keys*, 87

F.3d 795, 800 (6th Cir. 1996).  Enerfab has satisfied this burden by asserting that Schirmer's

position was eliminated as part of a reorganization that combined its Fabrication and Process

Divisions, a move made to streamline Enerfab's operations.  Schirmer must show that this

articulated reason is in reality a pretext to mask discrimination.

While the proximity in time between a request for FMLA-protected leave and discharge

is sufficient evidence of a causal connection for purposes of establishing a prima facie case of

retaliation, "it is not alone sufficient to establish that an employer's legitimate, non-

discriminatory reason for discharge was a pretext."  *Heady v. United States Enrichment Corp.*,

2005 WL 1950793, **4 (6th Cir. 2005) (*citing Skrjanc*, 272 F.3d at 317).  However, the evidence

_____

[14]  Schirmer took time off from work the majority of the month of April 2003 because of
her illness.  (Schirmer dep. at 134.)  She requested the FMLA paperwork in the "summer of
2003."  (Doc. 14 at 8; Doc. 18 at 11.)  Hock asked Schirmer's manager to assess Schirmer and
Bertsch's skill sets in July or August, 2003.  (Mills dep. at 53 ("Q.  Did Mr. Hock ask you to
provide any input into what you thought should happen in your department?  A.  He asked me
for skill sets. ...  Q.  Okay.  Did the conversation when he asked you about skill sets ... was this
the same one that you just told be about the two weeks prior to the announcement [that Schirmer
was to be terminated]?  A.  Yes.  Well, the skill-set situation probably was asked a month or two
months prior to that.")) Schirmer was terminated on September 1, 2003.

discussed at section A.1. herein tending to show a genuine issue of fact as to whether Enerfab's articulated reason for terminating Schirmer was a pretext for disability discrimination is likewise applicable to Schirmer's FMLA retaliation claim.

In combination, the temporal proximity between Schirmer's exercise of her FMLA rights and her termination, the inconsistent testimony of Enerfab's executives regarding the decision to reorganize and terminate Schirmer, and the internal memorandum referencing Enerfab's awareness that terminating an employee with health issues could expose it to a "medical discrimination claim" could lead a jury to reasonably conclude that Enerfab's asserted legitimate reason did not actually motivate the decision to terminate Schirmer. *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 804 (6th Cir. 2004). Construing the evidence in a light most favorable to Schirmer, as it must do at this stage of the proceedings, the Court finds that Schirmer has presented evidence sufficient to create a genuine issue of material fact that Enerfab's proffered reasons did not actually motivate the decision to terminate her, were insufficient to motivate the decision to terminate her, or had no basis in fact.

### B.    Public Policy

Schirmer next argues that Enerfab discriminated against her on the basis of her gender and her disability and retaliated against her for using FMLA leave, thereby violating Ohio public policy. (Doc. 1 ¶¶ 68-76.)  To succeed on a wrongful discharge claim in violation of public policy under Ohio law, a plaintiff must show that (1) a "clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law;" (2) that "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy;" (3) "[t]he plaintiff's dismissal was

motivated by conduct related to the public policy;" and (4) "[t]he employer lacked overriding legitimate business justification for the dismissal." *Parry v. Mohawk Motors of Michigan, Inc.,* 236 F.3d 299, 311 (6th Cir. 2000) (citing *Painter v. Graley*, 70 Ohio St.3d 377, n. 8, 639 N.E.2d 51 (1994)). To prove the second prong of the above inquiry, the plaintiff must show that there is no other recourse or adequate remedy available:

> An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim.... Where, as here, the sole source of the public policy opposing the discharge is a statute that provides the substantive right and remedies for its breach, "the issue of adequacy of remedies" becomes a particularly important component of the jeopardy analysis.... Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.

*Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 244, 773 N.E.2d 526 (2002) (internal citations omitted).

Schirmer's claim that Enerfab retaliated against her in violation of the FMLA and thus violated Ohio public policy fails as a matter of law. In *Wiles*, the Ohio Supreme Court held that a violation of the FMLA does not constitute a violation of Ohio public policy because the compensatory damages and equitable remedies afforded by the FMLA provide a remedy adequate to protect the public policy embodied by the Act. *Id.* at 245-46; *see also Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 727 (6th Cir. 2003) (holding that a cause of action for wrongful discharge in violation of public policy based solely on an employer's violation of the FMLA is unnecessary to vindicate the policy goals of the FMLA).

27

Schirmer's claim that Enerfab discriminated against her on the basis of her gender and disability and thus violated Ohio public policy also fails as a matter of law.[15]  While the Ohio Supreme Court has not directly ruled on whether the ADA and Section 4112 provide an adequate remedy such that a public policy claim on the same grounds is precluded, the Sixth Circuit has interpreted Ohio law as barring a public policy claim for wrongful discharge "if there already exists a statutory remedy that adequately protects society's interests." *Carrasco v. NOAMTC Inc.*, 124 Fed. Appx. 297, 304 (6th Cir. 2004) (unreported case).  Specifically, the Sixth Circuit found that "[b]ecause [plaintiff] has a remedy available to him under both Title VII and [Section 4112], we find that he cannot have that same claim under Ohio common law." *Id.* at 304.  *See also Feichtner v. Roman Catholic Archdiocese of Cincinnati*, No. 1:05-CV-00398, 2006 WL 571962 (S.D. Ohio March 7, 2006) (*citing Carrasco* and holding in an age discrimination matter that because the broad scope of remedies available under O.R.C. § 4112.99[16] sufficiently vindicated Ohio's public policy goals, plaintiff's public policy claim failed as a matter of law.)

Other courts in this district have analyzed *Wiles* and *Carrasco* and concluded that a plaintiff's disability discrimination claim does not give rise to a claim for wrongful discharge in violation of Ohio public policy.  *See Dillbeck v. Huntington Nat'l Bank*, No. 2:03-CV-0689, 2005 WL 1266690 (S.D. Ohio May 26, 2005) (unreported case) (relying on *Wiles* and holding that "[t]he statutory remedies that exist under the ADA and O.R.C. § 4112 are adequate to

---

[15]  Schirmer's public policy claim based on gender discrimination also fails because her underlying statutory gender discrimination claim failed.

[16]  Ohio Revised Code § 4112.99 broadly provides that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief."

protect society's interest in discouraging employers from engaging in discrimination and further provide sufficient compensation to the victims of such discrimination."); *Kolcun v. Nationwide Ins. Co.*, No. C2-04-cv-1079, 2006 WL 1447299 (S.D. Ohio May 24, 2006) (unreported case) (same).

While this Court has previously indicated that such public policy claims were cognizable under Ohio law, it now finds that Schirmer's public policy claim fails as a matter of law. The Court is bound by the Sixth Circuit's holding in *Carrasco* and agrees with other courts in this district that the broad scope of remedies available under O.R.C. § 4112.99 is sufficient to vindicate Ohio's public policy against discrimination and thus forecloses a separate cause of action for violation of public policy.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (Doc. 14.) Summary judgment is granted in favor of Defendant on Plaintiff's gender discrimination and violation of Ohio public policy claims but denied as to Plaintiff's disability discrimination and FMLA retaliation claims.

IT IS SO ORDERED.


     s/Susan J. Dlott       
Susan J. Dlott
United States District Judge